Ms. Jordan. Thank you, Judge Southwick. May it please the court. Ana Jordan on behalf of the City of Dallas. The First Amendment prohibits the enactment of laws abridging the freedom of speech. It does not guarantee a right to communicate viewpoints at all times, in all places, or in any manner one chooses, which is why reasonable time, place, and manner restrictions are constitutionally permitted. In this case, in response to a series of deadly shootings occurring in the early morning hours within the City of Dallas's Entertainment District, the City amended its Adult Business Licensing Ordinance to include an hours of operation provision prohibiting business activity between 2 and 6 a.m. The four hours encompassed by the regulation included the times when the shootings occurred, and when most non-adult entertainment businesses are closed, as well as times when service calls for law enforcement and emergency first responders was significantly high and trending upward, and when police presence is typically reduced. Without deciding which standard of scrutiny applied, the District Court granted a preliminary injunction on the ground that this classic time, place, or manner regulation violated the First Amendment because it allegedly failed both strict and intermediate scrutiny. That decision should be reversed because it flowed from several legal errors, two of which I will discuss today. First, the District Court erroneously assumed the regulation targeted speech because its application depended on the business definitions contained within the licensing ordinance. According to the District Court, in light of the Supreme Court's decision in Reed and this Court's decision in Reagan 1, specifically footnote 3, this determination rendered unclear whether City of Renton and Alameda Books continued to control the constitutional analysis, but after the Supreme Court in City of Austin clarified the scope of Reed's decision, rejected the view that a content-neutral regulation is rendered content-based merely by referencing or evaluating speech, there was no legal basis for the District Court to refuse to apply Renton and Alameda Books, which both instruct courts to review regulations like this one under an intermediate scrutiny standard after confirming that the regulation is a time, place, or manner restriction aimed at secondary effects, and because the record in this case conclusively demonstrates this regulation did that, the District Court's refusal to find at the outset that this regulation was facially content-neutral and therefore presumptively valid was error. I'll tell you straight up. For me, this case turns on the quality and quantity of the evidence that the City must adduce in order to show the link between the businesses . . . secondary effects that are being . . . between the businesses . . . I don't know, what do we call them, the businesses here? Adult businesses. Adult businesses. Great. And the secondary effects. So what's the amount of evidence? And so, the District Court had a number . . . it linked the opinion . . . had a number of criticisms of the evidence that the City relied on, the studies, and et cetera, et cetera. So, for me, it . . . the case really turns on whether the District Court raised the bar too high or did . . . or did not, or whether the District Court was identifying flaws in the evidence that are fair game. So what's your view on those things? Well, Your Honor, our position is that the District Court ignored a lot of the evidence. And so, what I'd like to do, if I could, at the Court's indulgence, with the Court's indulgence, I'd like to go through the evidence that was ignored by the District Court, which we believe, on its own, would support the conclusion that this regulation passed intermediate scrutiny. Before you get into the actual evidence, it seems to me, what standard should the District Judge have applied to the evidence? You say the same things, but what ultimately is the standard that the District Judge should be applying to the evidence of the City when it passed an ordinance? Well, in this case, because Renton and Alameda books have already determined that these kinds of regulations are . . . should be reviewed under an intermediate scrutiny standard, because the . . . I'm not talking about the level of scrutiny. What is it that the evidence is and whoever has the preponderance of the evidence wins? Or is there something else when you're talking about the judgment of a City Council in adopting an ordinance? So, the District Courts are required to start reviewing the City's evidence under a presumptively valid perspective. And so, once the City submits evidence that demonstrates that the regulation is aimed at secondary effects, the burden then shifts to the plaintiffs to prove with clear and convincing evidence that the regulation is not narrowly tailored to further substantial governmental interest and that ample avenues of communication are not left available to the plaintiffs. And that was their burden to show by clear and convincing evidence, which the City contends they did not meet. So, the City's evidence . . . the only obligation that the City had was to that it was a time, place, or manner regulation, which we did overwhelmingly. So I'm looking at Alameda, at the plurality opinion, which describes Renton, which I mean in my view is the controlling decisions that have been overruled. The Court says . . . We held that a municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial independent governmental interest, and in that case it's to combat secondary effects. I thought that was the . . . isn't that the standard? That is the standard, Your Honor, but it flows from the first premise, which is that the regulation is presumptively valid. And the reason that the City has such a light burden in this regard is because the District Court or the Supreme Court has determined that these regulations are really aimed at trying to control conduct, not speech. And so, yes, the standard for the City is that we just have to show that we are relying on evidence that we reasonably believe is relevant to the question of whether or not secondary effects of the speech will be combated with the regulation. And we did that here because this is a loss-of-operation regulation that was aimed at the early morning hours when the City believed that these violent shootings, these deadly shootings were occurring. And so the regulation does address that, and if I may go through the evidence that demonstrated that. Between 2020 and 2021, six deadly shootings had occurred within the City's Entertainment District, which is located within the Dallas Police Department's Northwest Patrol Division. Of these six shootings, at least four occurred in rapid succession within the adult businesses themselves or in their parking lots, and all six occurred in the early morning hours. In response to this pattern of violence, the Dallas Police Department created a task force to both investigate the cause of the violence and to suppress criminal activity occurring within the Northwest Patrol Division. To accomplish this, the task force deployed four two-man patrols between midnight and 8 a.m. on Thursdays, Fridays, and Saturdays. And while the task force patrols were in operation between March and October of 2021, at least five conditions came to light that caused the department to theorize that the early morning business activity occurring at the adult business properties was likely contributing to that violence. And if the court will indulge me, I'll go through those five factors. You can use your time however you like. I mean, we've obviously read the briefs, and we know the evidence that you relied on. My original question was the district court criticized your evidence in a number of ways. For example, the use of a 500-foot radius around the adult businesses, you know, including crime up to 6 a.m. when not all the businesses operated until 6 a.m. Increased police presence was allegedly distorting the data. And so, I mean, the district court went on for several pages about that, and I just wanted to hear your response to that. Is that the way that a district court ought to evaluate evidence in a secondary effects case under intermediate scrutiny? Generally speaking, Your Honor, no. The answer is no. But with respect to this case, the court focused on one piece of the city's evidence, which was the violent crime data. And we don't think that because intermediate scrutiny applies, the city is required to prove through empirical accuracy that this activity. We only need proof that we reasonably believe that that criminal activity will be suppressed. And so, what the plaintiffs have to prove is that it won't. It will, in fact, not suppress criminal activity. And so, what they did here was poke holes in the violent crime data, but Alameda Books requires more than that. They have to not only point out that there are gaps, but they have to produce evidence that is clear and convincingly, that clear and convincingly favors them, which they did not do. Well, I think one thing the district court was concerned about is the city didn't show that it had studied the, you know, the prevalence of violence around other businesses that are open late at night. What's your response to that? That's correct. Our response to that is that the 500-foot buffer is a buffer that is well documented and accepted as a crime risk. There is a study that we submitted. It is called, it's the McCord-Tewsbury. Were you required to, in your view, under the Renton-Alameda test, were you required to also study whether there was similar violent crime going on at all night? I don't know what other businesses are open at three o'clock in the morning. Gas stations? The plaintiffs alleged gas stations and restaurants, fast-food restaurants, were open 24 hours. No, we don't think that we were required to do that because we believe that the 500-foot buffer was sufficiently associated with the activity that was going on at the adult business properties. And this study that we submitted did, you know, talk about the spatial analysis of secondary effects related to crime rates. And that study appears that in the record at 1635 through 51. And that study did look at whether or not there would be a relationship between the activity of an adult business and the activity of a non-adult business. And they found that  activity of a non-adult business. And so they did a study in the buffer zone of 500 feet and they concluded that, quote, in the buffer of 500 feet, no other variable is more influential on crime rates than the presence of the sexually-oriented business. That means that the crime rates related within that area are associated with the business activity. Are you aware, you probably are, have other communities experimented with a 2 a.m. to 6 a.m. or some kind of time period like that with respect to these businesses? Not to my knowledge, Your Honor, but we don't think that we had to tie the regulation to a study like that. It didn't have to be that specific. In fact, Alameda Books says as much because in that case the city of Los Angeles didn't have a direct study either and the Supreme Court said that was not required. And so we don't think that we needed that tight a fit of a study to allow us to draw reasonable inferences from the evidence. So we would ask the court to focus on the record as a whole when it's looking at the evidence that the city produced here and I'll let Mr. Murray talk to you for a little bit and I'll return. Thank you. All right, counsel, thank you. Good afternoon. May it please the court, my name is Michael Murray and I rise on behalf of the plaintiffs at police in this case. Your Honors, and and Judge Duncan, I promise you I will get to the evidence, but I wanted in advance of that because I think there are some legal issues that are very important here as well and I think it's important to recognize that the Dallas ordinance that is challenged in this case is a content-based ordinance on its face because it identifies the businesses required to close between 2 a.m. and 6 a.m. Isn't that true of every secondary effects case on the books? They're all that way? There's some ambivalence about whether it's content-neutral or content-based and I think the justices recognize that, but isn't isn't that true of all the? Okay. Yes, but but but the key here is that you're gonna have to let us know what is meant by Reagan 1 because Reagan 1 specifically said that Reed was a sea change in First Amendment jurisprudence and it went on to say that it had to revisit all of its prior precedent on what standard to apply to a facially content-based law that is justified on the theory that it's serving a content-neutral purpose. Well, Reagan 1 has footnote 3 and it has some secondary effects opinions in it, some other non-secondary effects opinions in it. I don't know now if we did a search of everything that cited Reed or didn't cite Reed or just what the background of that footnote was, but it does seem to me even since Reagan, in cases such as Hegar or Hagar, we have returned to secretary effects and said that's still the law. Let me make sure I understand what your position is. I mean, obviously Reagan 1 was vacated by the Supreme Court and we dealt with what they vacated it about, but I think that makes suspect a fair amount of what was said in Reagan 1 with respect for the panel. So is your position that secretary effects law itself is now unstable or even been eliminated because of footnote 3? And that's all you have in it is footnote 3 of Reagan 1? No, I'm asking do you agree? In the Fifth Circuit, that's what I have, is your court and you of course remember the panel and you wrote the opinion on remand and I think on remand you recognized that the city of Austin still held that if it's discriminated on the basis of topic or subject matter, it's still content-based and that was the predicate for the . . . Well, secondary effects law has been around for a good while. Part of your argument is the Supreme Court in Reagan made some statements about how you determine whether something is content-based or not and you saying that didn't reference secondary effects or perhaps undermined that that's a separate doctrine? Yes, because the whole point of Reid was that the Supreme Court in an important decision said that even if you have a benign purpose, a content-neutral purpose, and you have no intent to censor the government's face, strict scrutiny applies and it doesn't matter what the government's purpose was and that logic and every court that's discussed it has said that's a sea change as did your panel in Reagan 1 and all I'm saying is that that's why Reagan 1 abrogated those secondary effects cases. I don't know if it abrogated it, but it did say each of those opinions needed to be reconsidered. I don't think it vacated or sought to say all those had been overruled. Well, I thought as I read the panel opinion that you joined, of course, it said that all of the cases that previously in the circuit, pre-Reid cases that applied intermediate scrutiny to a facially content-based law have to be abrogated as in violation of Reid and then it gave the footnote examples of the cases that had erroneously applied intermediate scrutiny and they were the four sexually oriented business cases. I guess my only follow-up to that is I'm really having trouble getting over the fact that Reagan 1, with all due respect to the esteemed panel in that case, was vacated by the Supreme Court. Yes, but not on the ground that we're urging the court to rely upon. I mean it's hard enough to find that the Supreme Court abrogates its prior precedent. There's a very high bar for that. The Supreme Court has to expressly do so and it sounds like the argument is secondary effects have been vacated because our panel suggested in a footnote that another Supreme Court case did but then that case was vacated by the Supreme Court. I just, I can't imagine how we could write that but who knows. I appreciate your skepticism. I just don't get it. That's what the Fifth Amendment is. And we would urge the court and the only thing I'll say about the Hagar case, Judge Southwick, is that Reagan wasn't on the radar because the district court decision came before Reagan, the appeal was filed before Reagan, the opening briefs were filed before Reagan, the response brief was filed six days after Reagan was decided and they didn't mention Reagan and then the oral argument, it wasn't mentioned. It just wasn't on the radar and that's why I think that it didn't, it wasn't taken into account. Well, it's on the radar now. We shall see. But getting, so we think, Your Honor, that the, apart from that, even under intermediate scrutiny that this ordinance fails. It fails under Justice O'Connor's plurality opinion in Almeida books because the requirement is that the city cannot get away with shoddy data. The city's evidence must fairly support its rationale and the plaintiffs are given two ways to contest the city's evidence. Either by showing that the city's evidence doesn't really support its rationale or by introducing other evidence that contradicts what the city's claimed evidence shows. Well, Counsel, we have, my colleague already quoted some of the language from Almeida and from Renton about, and they're different words and different opinions, you put different weight on them, but Supreme Court in one state said, does the city reasonably believe this evidence supports what they're doing? Am I right to look at what the city did here as a legislative judgment, not a judicial decision based on conflicting evidence, but a legislative decision based on evidence that they found reliable, put it into motion and it works or it doesn't work, but your view seems to be, and Judge Lynn's view, I mean, she made a very good assessment of problems with the evidence as opposed to a legislative judgment. Well, except, Your Honor, if you take into account what Justice O'Connor wrote in the plurality opinion, she says, this is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. Plaintiffs, if plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, then the city succeeds. But if the plaintiffs do succeed in casting doubt upon the city's evidence and its rationale, then the burden shifts back to the city. That's what the plurality held, Your Honor. So yes, the city initially, um, uh, is required to present evidence that is reasonably believed to, uh, relate to the so-called secondary effects problem that they're addressing. But they, they can't do that on the basis of shoddy evidence, and we have a right to challenge the evidence, and that's what we did. And, and, and remember, this was an intensely factually, um, bound case. There were three full days of an evidentiary hearing, and the district court made meticulous findings of fact that were supported by the evidence, and none of those findings were clearly erroneous, and that's the standard on a preliminary injunction on appeal as to whether those factual findings were clearly erroneous. And those facts led the court to conclude that Justice O'Connor's, uh, test was met by the plaintiffs, that we demonstrated that the evidence was shoddy and didn't fairly support their rationale. She also found out, remember, Justice Kennedy's concurring opinion in Almeida Books, almost every court that has considered it says that's the controlling opinion. And he says, in addition to, uh, what the plurality said, he said you can't reduce secondary effects by the simple expedient of reducing speech. So you can't, for example, in our view, just close businesses down that present constitutionally protected speech, because all that does is reduce the quantity of speech that is available. And that's what Justice, uh, Kennedy says can't be done. But on the evidence... So Justice, you're, you're saying Justice Kennedy's opinion in Almeida is the controlling opinion. I think there's probably some, that makes sense. There's some support for that. But look, look at what he says in, in his, in his controlling opinion. I mean, in this case, the proposition to be shown that is the, uh, sort of, uh, having an adult mini mall instead of multiple adult businesses next to each other was what Los Angeles was trying to prevent, which is supported by a single study and common experience. The city, the city study shows a correlation between the concentration of adult establishments and crime. And he goes on to that didn't even address the specific ordinance. It addressed it, it addressed sort of an analogous situation and the Supreme Court allowed sort of a reasonable inference from that one study. So here, just comparing the amount of evidence that the city and, and sure you can pick at it and the district court did a fine job of picking at it, but there seems to be, to be much more evidence here, uh, with respect to, um, to the adult oriented businesses than in city of Los Angeles. What do you think? Keep in mind, Your Honor, in Elmira Book's case, they did not uphold the ordinance. All they said was that the study that the city proffered that hadn't really been contradicted by the plaintiffs was sufficient to withstand summary judgment against the city. They didn't uphold the ordinance. The plaintiffs were free to go back and use Justice O'Connor's to try to contest the evidence. Sure. I realize we're in a different procedural posture. You're, you had the burden of making a clear showing that you're substantially likely to succeed on the merits of the first amendment claim. But let me just give you a few of the highlights because I've only got eight minutes left and there are so many flaws in the city's, uh, evidence that, that demonstrate it doesn't fairly support its rationale and that the factual findings were, um, so they call data from 35 locations within 500 feet of 35 locations, crime statistics, offenses, property crimes, foster service, et cetera. Um, they do nothing with the numerous businesses that are still open late at night and those that do include gas stations, convenience stores, drug stores, nightclubs featuring non-adult entertainment. If you don't present adult entertainment, you're allowed to stay open. If you have a food permit till 4am, if you're a nightclub, but where, where are the cases saying that I have to have sort of comparative studies to show that there's more crime going on outside of, of adult businesses than gas stations at three o'clock in the morning? Well, because if you want to apply to common sense, if the, if the theory is that we're going to close down section oriented businesses based on their content because we believe that closing them down will reduce crime, you ought to find out whether or not if you're going to single them out on the basis of content that it's really true that they are creating a problem that other late night businesses that you're going to allow to remain open are not creating. In a first, and this is a first amendment business that is being closed, whereas many of these other businesses are not first amendment businesses. I was just asking what case says we have to have those kind of comparative studies. I think Almeida Books allows us to challenge the city's evidence on any... I agree, I agree with you on that. And so that's one of the grounds. Now, the other thing is, and, and Lieutenant Bishop, who's their 30B6 witness and who testified for the city said he has no idea whether crime is less the same or more within 500 feet of all those other late night businesses. No idea at all. The other thing is... Counsel, if you'd stop for a moment there, I mean, this is not a discrimination case. Uh, it is a first amendment case and we need to define what the right standard is. It seems to me, respond to this, it seems to me that the city's evidence supports a reasonable forecast by the city council based on the evidence that they had that making these restrictions of sexually oriented businesses will reduce crime in those areas regardless of whether they could do more around gas stations or, or fast food places. Isn't that enough? Except that the, except that that's not what those, what the studies show. That's not what the police data show. Do you agree though that would be enough if the evidence did support that regardless of what else may be happening in other locations that are open late, uh, if they made a decision, uh, based on their judgment that this evidence supports closing these businesses earlier will reduce crime in that area, that would be enough to support it? Perhaps, but that's not what happened here. You're a good advocate, you don't concede anything, but keep going. But for example, so Lieutenant Bishop admitted that the ordinance was undermined, the rationale was undermined, for example, by looking at priority one calls because the topless clubs, which were closed during most of those hours, had more priority one calls than the adult bookstores that were open 24-7 and the nude clubs that were open far more hours. And he says, yes, the opposite should have been shown by that crime statistic. Same was true with, um, violent crime. The other thing is that there were seven locations that either part or all of the time weren't even operating. And yet, what percentage of that, uh, is that of the total? Well, seven of 35, so 20%. However, you got to add to that, there were, um, 10 topless clubs that from Sunday to Thursday closed at two o'clock. So 17 of the businesses that they were studying were closed during the hours of 2 a.m. to 6 a.m., um, from Sunday to Thursday. Yet they, they included all of that data from those closed businesses, theoretically, to support an ordinance that is going to say that we'll reduce crime if you close the businesses. Well, the businesses were closed and yet they still counted all the criminal events that occurred within 500 feet of, and that's half of the businesses that were closed. And, uh, Lieutenant Bishop said he never even bothered to find out what the hours were of these businesses to figure out whether or not he was studying businesses that were open or closed. And so how does that, that's the definition of shoddy data in my view. If you're trying to decide whether or not closing the businesses will reduce crime, you shouldn't be counting all the criminal events within 500 feet of the businesses when they are in fact closed. And nearly half of the businesses were closed. That's just one example. The, the combined violent and property crimes between, uh, 2 a.m. and 6 a.m. were less than the, uh, crimes between 10 p.m. and 2 a.m. What about if you just focused on the violent? If you focus on the violent crime, um, what you find is that, um, let me get to the violent crime because, um, the violent crime, for example, the, okay. And I thought the stats said it went up. Violent crime offenses reported within 500 feet of the businesses between 2 a.m. For three years there were 11 of those within 500 feet of the nine adult bookstores. One reported crime every three months at one of the nine businesses, none at the other eight. Um, 66 at the nude clubs, nine nude clubs over three years. That means one offense every 16 and a half days at one of the nine locations and none at the other eight. 45 at the 10 topless clubs. One every 24 days at one of the 10 and none at the other nine. How does that fairly support a rationale that those businesses all have to be closed between those hours when the, their own evidence shows that almost no crime is occurring within those 500, violent crime is, is occurring? Um, I mean the bookstore evidence was, was clearly, uh, unsupportable. For example, um, violent crime arrests within 500 feet. At the bookstores between 10 p.m. and 2 a.m. there were five in the three-year period. There were only two in the three-year period that was, that they studied. Two offenses over three years, um, two violent crime arrests. 11 at the nine full nude bars. That's a little over one arrest for a violent crime every year at one of the nine. Seven of them were at the 10 topless clubs. It took more than a year for one violent crime arrest to occur within 500 feet of the topless clubs and that means one club and the other nine they had, there were none. So, um, priority one calls over three years. 56 at the nine adult bookstores. Um, that means every 19 and a half days at one of the nine locations there was a priority one call. The nude clubs, once, one every 18 days at one of the nine call. At the topless clubs, once every 13 days there was a priority call within 500 feet of one of the 10 topless clubs and none at the others. I could go on and on. I'm telling you the evidence, the judge was perfectly within her right to evaluate this evidence and decide as a factual matter that we proved our case. And I see my time is up. Thank you so much. Your Honor, um, here's the problem with the way that Mr. Murray is reviewing that evidence. So there are two layers of crime, criminal activity that we're talking about here. Just, uh, that the documented secondary effects studies do prove that there is this association with increased crime rates just generally. These are victimless crimes like prostitution, public lewdness, uh, these kinds of criminal activity that attract predators and that kind of thing. But here, and, and municipalities may have, uh, you know, they can, they're willing to tolerate a certain level of that victimless crime. But when that victimless crime starts to turn into violent crime, which is what happened here, uh, then the municipality, the city of Dallas stepped in to make sure to stop that and to prevent future shootings. Okay. So when we're talking about the violent crime data, it's focusing only on those aggravated, uh, violent crimes involving weapons and, uh, deaths, uh, shootings. And so the, the data here proves the rule, right? So we looked at seven deadly shootings that occurred within the, uh, entertainment district. Five of those were, uh, happened at these adult businesses or in their parking lots. Uh, when you look at, there's also some testimony from Steven Kraft who, uh, testified that baby dolls in this, uh, in city, in the city of Austin has two locations. One is not an operating sexually oriented business. The other one is. And if you look at the calls for service related to them, uh, it, it bears out the rule again. So, um, the baby dolls, that's not a sexually oriented business that is located on technology, technology drive, uh, calls for service, uh, arising from that location were a total of 67 between the years of 2018 and 2021. Between the two years, there were only 32. But when you look at the baby dolls on shady trail, which is adult business operating as a topless, uh, cabaret, you look at the same timeframe, 419 calls for service, uh, between 2 AM and 6 AM, 214 in that timeframe. So this evidence does prove the rule that these adult businesses are associated with increased crime rates generally. Well, you say prove, I mean, we're, we're here on the granting of a preliminary injunction, correct? That's correct, your honor. So I, I guess what's going, is it true? What's going to happen is it's going to go back, uh, in, in some way, either, uh, affirmed or vacated. And there will be a, what, what's going to happen after, is there going to be more discovery and a trial in the merits? Is that what you feel? There likely will be some more discovery if the plaintiff, uh, I mean, we may file a motion for on the evidence as it exists, unless the plaintiff, because we do believe that this evidence is sufficient to withstand, uh, intermediate scrutiny. Uh, but, uh, if the court is willing to, uh, just flat out state that this does pass intermediate scrutiny, we're asking the court to reverse the district court's ruling on the preliminary injunction. And if the court is willing to render, uh, on this evidence, uh, we would not be averse to that either. Um, I do want to point out, uh, that what Mr., uh, Murray said with respect to as Gearson. Now, as Gearson had two rules, uh, as Gearson talked about, um, uh. Which, which case are we talking about? So Reed clarified, for example, that Ward stood for the proposition that while a facially content based, I mean, sorry, while a facially content neutral regulation can be rendered content based by its justification or purpose, the inverse is not true. In other words, a facially content based regulation cannot be rendered content neutral by looking at its function or purpose. And in, as Gearson, there were two rules that it cited. It cited, uh, a rule, quote, a regulation is not content based merely because the applicability of the regulation depends on the content of the speech. That rule was not overruled by Reed. Reed overruled the second rule in as Gearson, which stated, quote, a statute that appears content based on its face may still be deemed content neutral if it is justified without regard to the content of the recognized. But what Reagan did was it, it, it basically cut and paste, pasted all of the cases that as Gearson cited in its footnote seven, and then put it in footnote three. And the problem with as Gearson is that it did lump in together, um, some non, um, some adult business regulation cases with its non-adult business, uh, cases. But I think as Gearson was correct in the ruling and, uh, only one of those rules was overruled by Reed. Thank you, Your Honor. We'd ask the court to reverse. Thank you both for bringing your understanding of this case to us. We'll take it under advisement.